IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
                             )
     v.                      )     CIVIL ACTION NO. 06-0086
                             )
                             )     JUDGE CONTI
OHIO VALLEY GENERAL HOSPITAL, )
a Pennsylvania Corporation,  )     ELECTRONICALLY FILED
                             )
          Defendant.         )

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Consistent with its prior conduct in seeking Medicare reimbursement, as well as its conduct to date, in this litigation, Ohio Valley General Hospital ("OVGH") has misstated facts, withheld documents fatal to OVGH's arguments and inundated the Court and the United States with documents not relevant nor material to the affirmative defenses asserted.  OVGH begrudgingly acknowledges it incurred no monetary expenses, or payouts in connection with the settlements of prior healthcare-related false claims actions, the amount of which it alleges totalled $1.8 billion.  Yet, OVGH now audaciously claims that the settlement of these prior actions, that it did not participate in litigating,

precludes this present action by the United States.[1]  OVGH is simply and emphatically wrong.

Sorting through the hyperbole and non-germane or conclusory arguments submitted by OVGH in support of its claim of entitlement to summary judgment, much of the relevant inquiry actually boils down to the two (2) releases OVGH executed as ancillary "managed" facilities by the larger corporate entities that were the focus of prior litigation.  While these releases do afford the non-defendant hospitals, such as OVGH, some protection from litigation and/or administrative action, they clearly do not afford the breath of relief argued by OVGH.

OVGH's Motion and Memorandum cite multiple healthcare-related false claim actions.  For the purposes of this response, they will be referred to as "HCA/Columbia Healthcare" litigation, "Quorum" litigation and "Curative" litigation.  OVGH, without any documentary support, implies OVGH is somehow protected by the settlement of the HCA/Columbia Healthcare litigation.  Since OVGH offers no further proof, this litigation need not be discussed further.  This response will discuss why the Quorum and Curative litigation do not support OVGH's assertions.  That is, neither

---

[1]  OVGH was a named Defendant in one action filed by two relators in the S.D.N.Y.  The United States did not join in the portion of the complaint pertaining to OVGH.  Nor did OVGH ever respond or otherwise take any action in that litigation other than to execute a one paragraph agreement to join in the Settlement.  See, arguments and exhibits filed in conjunction with this Memorandum.

settlement and release executed in those cases encompass the allegations in the United States' present Complaint.

The Quorum litigation[2] pertained to a "corporate policy" of aggressive, improper conduct of filing yearly Medicare-mandated "cost reports" by Quorum Health Group, Inc. ("Quorum")[3] owned or managed hospitals, where costs for purposes of Medicare reimbursement were improperly stated and in certain instances, overstated.  This "corporate policy" entailed keeping reserve funding associated with "reserve" cost reports or work papers, not shared with Medicare, that reflected more accurate costs and/or accounting.[4]  Thus, this litigation focused solely on the "reserve" or second cost reports maintained by Quorum owned or managed hospitals.  In particular, the United States' investigation and subsequent complaint in the Quorum litigation, as it pertained to OVGH, was only for the years from **1988 to 1994**.

As will be discussed more fully, the present Complaint only pertains to the time period of October 13, 1998 forward.[5]  The fact that the Quorum Complaint filed by the United States alleged

---

[2]  Quorum Health Resources, Inc. (Quorum) was spun off of Hospital Corporation of America (HCA).  See, Defendant's Simmons, Exhibit 4, ¶2.

[3]  These Complaints are Defendant's Simmons Exhibits 1, 2, and 4.

[4]  For example, See United States and Relator Alderson's "Quorum" Complaint in 99-413-CIV-T-24B (M.D.Fla. - Tampa Div.) (Simmons Exhibit 1, ¶3) and Alderson's earlier *qui tam* Complaint (Simmons Exhibit 4, ¶5).

[5]  See, Stipulation regarding Claims at Issue (Docket No. 46).

Quorum's conduct existed from January 1, 1985 through the present (February 24, 1999) is not material to this present Complaint in light of the OVGH related exhibits attached to the Complaint which OVGH fails to even acknowledge by presenting to the Court.[6]

The <u>Curative</u> litigation, contrary to OVGH's representations, did **not** settle all of the allegations contained in the Relators' Complaints.[7]  As will be discussed more fully, only certain allegations made by the Relators' (Lanni and Parslow) were resolved.[8]  None of the resolved allegations are contained in the United States' Complaint against OVGH in this instant action. Thus, the release executed by OVGH in the <u>Curative</u> litigation does not release OVGH from the allegations in this present action.

This response will also discuss OVGH's other affirmative defenses.  Its assertions that the United States' claims are time-barred or precluded by the application of the equitable doctrine of laches are also wrong.  OVGH, again, misstates applicable law, or simply ignores controlling law.  These

---

[6] <u>See</u>, OVGH's Memorandum of Law, p.6 as well as Plaintiff's Exhibits B and C.

[7] Only one of these Complaints has been presented to the Court in support of Defendant's Motion.  (Defendant's Simmons Exhibit 3).

[8] Those allegations are the ones contained in ¶¶14, 15, 278-290 of the Sixth Amended Complaint.  (Simmons Exhibit 3)  <u>See also</u>, Plaintiff's Exhibit F(1) and F(2).

defenses are also premised upon factually incorrect foundations, most of which OVGH knows, or should know, are incorrect.

OVGH advances arguments pertaining to when the United States allegedly began investigating OVGH, or should have known of allegations of impropriety committed by OVGH.  These arguments are **not relevant** in light of the United States' Stipulation that it will rely upon 31 U.S.C. § 3731(b)(1) and any applicable tolling agreements for the false claims asserted in the Complaint.[9]  Knowledge by the United States, or its agents, of OVGH's illegal behavior is not an element of consideration for determining whether the U.S. claims are timely.[10]

OVGH makes "much ado" over the similarity of the pleadings in the prior Complaints to this present Complaint.  OVGH's arguments are meaningless and not relevant.  Although some of the allegations may be similar, or even identical, the claims asserted by the United States against OVGH are not "covered conduct" encompassed by the two executed releases OVGH has presented.  In fact, since the conduct in this present action and the prior complaints all pertain to a comprehensive and involved Medicare program for the payment and reimbursement for delivery

---

[9]  31 U.S.C. § 3731(b)(2)allows additional time of three (3) years, not to exceed a total of ten (10) years, rather than the six (6) years from the date of the false claims allowed by 31 U.S.C. § 3731(b)(1).

[10]  The United States does not agree it knew of OVGH's false claims prior to 2002.  The United States has merely agreed to simplify the issue by eliminating any argument as to when the United States knew, or should have known of the subject matter of this Complaint.

of certain health services, and in particular, the proper

reporting and submission of yearly cost reports for year-end

adjustments for Medicare monies already paid, the pleadings, by

subject matter, will be similar.  OVGH's arguments, in this

regard, are not affirmative defenses, nor do they support any

cognizable defense.

**II.  <u>ARGUMENT</u>**

OVGH has advanced three arguments in support of summary

judgment.  For the reasons stated below, none of these arguments

are valid and must be rejected.

A.   <u>Summary Judgment</u>

Summary judgment is to be granted only when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and ... the moving party is

entitled to a judgment as a matter of law."  Fed. R. Civ. P.

56(c).  A fact is "material" if proof of its existence or non-

existence might affect the outcome of the suit under applicable

law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986).  And a dispute is "genuine" if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.

<u>Id</u>.

All doubts as to the existence of a genuine issue of

material fact are resolved against the moving party, and the

6

entire record is examined in the light most favorable to the nonmoving party.  Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  However, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson, 477 U.S. at 257.

However, final credibility determinations on material issues cannot be made in the context of a motion for summary judgment; nor may the District Court weigh the evidence.  See Josey v. John R. Hollingsworth Corp., 996 F.2d 632 (3d Cir. 1993).

B.   OVGH Has Not Been Released For Any of the Claims Asserted.[11]

OVGH's attempted use of press releases, cover letters received by OVGH from both Quorum and Curative, or other "collateral" sources to define the scope of the language within a release is improper.  It is axiomatic that absent an ambiguity upon the face of an agreement, it is improper to look beyond the language utilized in defining the terms of a legal document.  See New Wrinkle, Inc. v. Armitage, 238 F.2d 753, 757 (3d Cir. 1956). OVGH does not allege that any ambiguity exists in the releases; therefore, the scope of the release is not controlled by press releases or other one-sided documents such as cover letters.  See also, E.D. Rich Co. v. Wilmington Housing Authority, 392 F.2d 841, 842 (3d Cir. 1968) ("where the language of a contract is

---

[11]  For purposes of this Response, only those claims asserted that occurred after October 13, 1998 are encompassed by these arguments in light of the Stipulation entered.  See, Docket No. 47.

clear and without ambiguity and leads to a meaning which is both
reasonable and sensible, there is no need to look beyond it in
search of some other intention").

Since both the Quorum and Curative release reference
particular averments or allegations within certain complaints as
part of the definition of "covered conduct" as to the scope of
the release, only those specified documents, in addition to the
actual releases, should be considered by the Court.  OVGH's
attempt to support its argument as to the expansive breadth of
the releases by referencing such collateral documents should be
rejected.

Neither of the two releases executed by OVGH in the <u>Quorum</u>
and <u>Curative</u> litigation are applicable to the claims asserted by
the United States against OVGH in the instant Complaint because
the present assertions are not "covered conduct" for either
release.  Rather, as will be demonstrated, what OVGH obtained
from the releases for which they provided **no** monetary
consideration was much more limited than what OVGH now suggests.
The Quorum release was limited, at most, to cost reports
submitted to Medicare on behalf of OVGH for the years 1988-1994.
The Curative release was limited to certain unallowable marketing
costs which are not plead in the instant Complaint.

8

1.   <u>The Quorum Release</u>

The Quorum Settlement Agreement and Release was filed at 99-413-CIV-T-24B (M.D. Fla.-Tampa Div.)[12]  The "covered conduct" pertaining to the scope of the release was defined in paragraph II C.  This paragraph reads:

> All of the United States' and Relators allegations in the Complaint in the above-captioned Action and in the United States' and Relator's Complaint in the predecessor action, <u>United States ex. rel. Alderson v. Columbia/HCA Healthcare Corporation, et al.</u>, Case No. 97-2035-CIV-T-23E (Middle District of Florida)(the "Predecessor Action") (collectively, the "Complaints'), are referred to jointed as the "Covered Conduct".

Exhibit A attached to the Release was submitted by Quorum to its managed hospitals for voluntary execution.  OVGH in turn, executed this Release and did nothing else affirmatively.[13]

Covered conduct was not so broadly defined as OVGH misstates as "all of the United States' allegations in the Quorum and Columbia/HCA Lawsuits".[14]  Rather, the scope of covered conduct was more limited than OVGH's present view.  It was limited to the two (2) Complaints specifically cited.  In fact, as to OVGH, it was in particularly limited to actions prior to 1995 (years 1988-1994).

----

[12]   <u>See</u>, Plaintiff's Exhibit G.

[13]   <u>See</u>, Provenzano Affidavit, ¶¶9 and 10.

[14]   <u>See</u>, OVGH Memorandum of Law, p. 17.

a.   A Fair and Balanced Reading of the Quorum
     Complaints.

OVGH essentially argues that the release that they "piggy backed" in the Quorum litigation affords OVGH protection for **all** improper submissions, not just in cost reports, but all submissions for federally funded healthcare reimbursements from January 1, 1985 through February 24, 1999.  This argument greatly overstates the breath of Complaint for the years in question.

A fair and balanced reading of the Complaints demonstrates that the scope of conduct is much narrower.  The two Complaints generally allege and are limited to costs itemized in reserve cost report summaries prepared by Quorum.[15]  In fact, when the exhibits to the United States' Complaint in the Quorum litigation are reviewed, it is obvious that not even all of the items in the reserve cost reports or summaries are within the scope of the Complaint and, therefore, the release.  The United States attached the numerous "reserve" cost report summaries to its Complaint that were provided by Quorum in response to investigative demands prior to the filing of the Complaint of the United States then highlighted the items believed to be actionable.[16]  This exclusion of certain known reserve cost items

---

[15]  OVGH has steadfastly maintained that it has no "reserve" cost reports or summaries.

[16]  See, highlighted portions of Plaintiff's Exhibit C.

totally refutes OVGH's assertions as to the expansive breath of the covered conduct.

Neither of the two referenced Complaints in paragraph II C of the Release assert claims that have been asserted by the United States in this action.  Although the United States' present Complaint sets forth the historical "aggressive" cost report preparation policies, it does not allege OVGH maintained reserve cost reports or work papers.  Rather, the United States has asserted that OVGH has "knowingly" submitted untruthful and incorrect claims for reimbursement, without any regard for the possibility of corrective action.  In other words, OVGH's actions in 1998, 1999, and 2000 went "way beyond" the aggressive and improper reporting policy pursued by Quorum that was the focus of the earlier litigation.[17]

    b.    The Scope of the Quorum Release Is Further
          Limited as to OVGH.

Realizing that certain exhibits attached to the United States' Quorum Complaint were fatal to its argument, OVGH failed to attach them to the Complaint presented in support of its Motion, merely asserting the exhibits "were nearly a bankers' box in size".[18]  While most of the exhibits are not germane to the

---

[17] See, Murray Declaration, ¶ 11.

[18] See, Defendant's Simmons Affidavit, ¶3.

11

instant issue, two most certainly are.  These are Exhibit 5 and Exhibit 167.[19]

Under Federal Rule of Civil Procedure 10(c), "[A] copy of any written instrument which is an Exhibit to a pleading is part thereof for all purposes.[20]  Thus, all of the "bankers box in size" exhibits attached to the Complaint must be considered part of the pleading.  To the extent these exhibits are at a variance with or contrary to any sweeping, conclusory allegations within the Complaint, the exhibits are controlling.  See, Moore's Federal Practice ¶10.06, pp.10-24 and M.5 (1991).

Exhibits 5 and 167 make evident that the Complaint only asserted that Quorum prepared cost reports for OVGH from 1988 through 1994.  This information, which was supplied by Quorum, may not have been accurate,[21] but it was plead in the Complaint by way of exhibit.[22]  Quorum provided reserve work papers

---

[19] See, Plaintiff's Exhibits B and C.

[20] Rule 10 was recently amended December 1, 2007, so that this sentence of (c) reads:  "A copy of a written instrument that is an Exhibit to a pleading is a part of the pleading for all purposes."

[21]  The Provenzano Affidavit indicates that he is the President and Chief Executive Officer of OVGH.  The United States has information indicating he is/or was at one time a Quorum employee.  It is not clear from his affidavit how many years OVGH has contracted with "hospital management service providers", nor for what type of service.  The United States' investigation indicates that for the instant litigation, OVGH's cost reports were prepared, reviewed and authenticated by OVGH employees under Provenzano's control and direction.  The United States' investigation has also uncovered evidence that even after certain Quorum consultants uncovered improper billing practices at OVGH and recommended self-reporting, this Quorum advice was ignored by OVGH and  Provenzano.  See, Murray Declaration, ¶ 11.

[22] Plaintiff's Exhibit B, pp.49-50.

relative to OVGH only for the fiscal year ending 6/30/1990.[23]
The items on this work paper were reviewed to determine what
costs were improperly submitted.  These were then highlighted.
For OVGH, the total amount for the 1990 cost report was
$36,000.00.  The release, executed by OVGH in the _Quorum_
litigation at most, pertained to the years reflected for OVGH in
Exhibit 5 (Plaintiff's Exhibit B), and arguably only to the cost
report for 1990.

OVGH's intentional omission of these Exhibits is telling.
When confronted with contrary evidence, refuting contentions
advanced, OVGH blithely ignores such evidence.[24]

2.   The Curative Release

None of the "covered conduct" encompassed by the _Curative_
Release executed by OVGH, is within the scope of the United
States' Complaint in this instant action.  OVGH is again wrong in
its assertion regarding the scope of the covered conduct.  OVGH
misstates what some of the documents they have attached as
exhibits actually are.  OVGH, also, again, simply ignores express
language in documents that is contrary to its assertions.

---

[23]   Plaintiff's Exhibit C.

[24]   In OVGH's initial Motion to Dismiss filed in this action, it argued the
claims asserted by the United States were precluded by the applicable statute of
limitations.  OVGH's argument totally ignored the six (6) tolling agreements it
had previously voluntarily entered into tolling all applicable statutes.

The full scope of the "covered conduct" for the Release at issue is defined in OVGH's Simmons Exhibit 17 in ¶¶ II B and II C.  These paragraphs states:

> B.  The Hospital Defendants are individual hospitals that are not owned, operated, or managed by Defendant HCA - The Healthcare Company (HCA), that entered into contracts with Curative, that operated WCCs, and that are named as Defendants in the Sixth Amended Complaint filed in this action.  The Settling Hospital Defendants are those Hospital Defendants that entered into contacts with Curative, that operated WCCS, and that execute this Stipulation and Order within 90 days of its entry, pursuant to Paragraph 28 herein.

> C.  The United States contends that it has certain civil claims against Curative and the Hospital Defendants (collectively, the Defendants) under the False Claims Act, 31 U.S.C. §§ 3729-3733, other federal statutes and/or the common law, as specified in Paragraph 2 below, for engaging in the following conduct during the period from January 1, 1993 to **December 31, 1998**:  Defendants made or caused to be made in hospital cost reports submitted to the Medicare Program (Medicare), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg, improper claims for reimbursement of management fees paid by Hospital Defendants to Defendant Curative (1) (**which contained non-allowable marketing or advertising costs because these costs were not reimbursable by Medicare)**, as described in the portion of the Sixth Amended Complaint in which the United States has intervened in this action, and (2) as set forth in the United States' Complaint in United States ex re. Parslow v. HCA – the Healthcare Company, Case No. 99-3338 (D.D.C.)(hereinafter referred to as the Covered Conduct). (emphasis added)

The Sixth Amended Complaint [25] filed by relators was filed on the same date that the United States filed its Notice of Election to Intervene in Part and Decline to Intervene in Part.[26] Also filed at the same time was the Stipulation and Order of Settlement executed by the United States, Relators and Curative.[27]  The Court date stamps on all three pleadings show they were received January 2, 2002 and filed January 4, 2002.

Covered conduct of the <u>Curative</u> Release is limited to <u>United States ex re. Parslow v. HCA – the Healthcare Company</u>, Case No. 99-3338 (D.D.C.)[28] and the portion of the Sixth Amended Complaint that is referenced in the United States Notice of Election to Intervene.  It is **not**, as argued by OVGH, all of the allegations in the Sixth Amended Complaint.[29]  A review of the portions of the Sixth Amended Complaint, adopted by the United States, and referred to as "covered conduct", clearly demonstrates that these assertions are essentially identical to the United States' <u>Curative</u> Complaint, i.e. limited to **"non-allowable marketing or advertising costs"**.[30]

---

[25] OVGH's Simmons Exhibit 3.

[26]  Plaintiff's Exhibit F(1).

[27]  OVGH's Simmons Exhibit 17.

[28]  Plaintiff's Exhibit D.

[29]  <u>See</u>, Defendant's Memorandum, Part B.2, pp. 18-19.

[30]  <u>See</u>, Plaintiff's Exhibits F(1) and F(2) as well as Plaintiff's Exhibit D.

15

OVGH's assertion that the <u>Curative</u> Release encompasses the United States' WCC-related claims against OVGH in the present action is also wrong since it is premised on the belief that the United States either filed or adopted the entire Sixth Amended Complaint.  The United States only intervened as to a small portion of this Complaint that was consistent with the United States' Complaint against <u>Curative</u>.  The portion of the Relators' Complaint the United States adopted by intervention contained <u>no</u> specific time period.

The United States **declined** to intervene in any portion of the Relator's Complaint that may have alleged a time period. However, the United States' Complaint did reference a time period of "January 1, 1993 through at least December 31, 1998."[31]   This is the same time period stated in paragraph II C pertaining to "covered conduct".  However, since the Release is not applicable to the United States' present claims, OVGH's time period arguments are not relevant.[32]

---

[31]  <u>See</u>, Plaintiff's Exhibit D, ¶2.

[32]  Even if OVGH was correct in its argument regarding the breath of the release, the time period would only be applicable to WCC-related claims from October 18, 1998 up through December 31, 1998.

16

C.   The United States' Claims Are Not Time-Barred Nor
Do the Doctrines of Laches and Equitable Estoppel
Apply.

1.   Statute of Limitations

The United States timely filed the Complaint at issue in
this case within the applicable statute of limitations.  A civil
action may be brought pursuant to the False Claims Act no more
than 6 years after the date on which a false claim is submitted
or presented.  See Title 31, United States Code, Section
3731(b)(1).  In this case, the United States did file its
Complaint within the applicable 6-year time frame given that a
considerable amount of time, some 15 plus months, was tolled or
excluded by a series of Tolling Agreements entered into between
OVGH and the United States.[33]  As a result of these agreements,
the United States had until January 23, 2006 to file a Complaint
pursuant to the FCA, which it did so by filing the Complaint in
this case on January 19, 2006.

The United States launched its investigation into this
matter in mid-February 2002, when Agent Murray received
allegations of possible wrongdoing by certain hospitals.[34]  Her
investigation uncovered false claims being submitted to Medicare
by OVGH.  Since by stipulation, the first claims at issue in this
case are claims which OVGH submitted on or before October 14,

_____

[33] See, Plaintiff's Exhibit J.

[34] See, Murray Declaration, ¶ 2.

17

1998, the statute of limitations begins running as of that date.
See Title 31, United States Code, Section 3729(a).  It continued
to run unabated until the effective date of the Original Tolling
Agreement, June 25, 2003.

The United States and OVGH executed a series of Tolling
Agreements, an original and six (6) Amended Agreements ("Tolling
Agreements"), beginning June 25, 2003 and extending to
September 30, 2004, a total of fifteen (15) months and five (5)
days.[35]  The Tolling Agreements were agreed upon in order to
attempt to resolve the case prior to the filing of a complaint.
In the Agreements, the United States unequivocally expressed that
it wanted to avoid the running of or expiration of the statute of
limitations during the period of settlement discussions.  As a
result, both parties agreed that the period of time for each
Tolling Agreement, beginning June 25, 2003, and extending in
increments[36] until the final end date of September 30, 2004 (6th
Amended Tolling Agreement), " . . . shall be excluded from any
and all of the applicable statute of limitations periods which
would otherwise apply, and OVGH will waive and not plead or
otherwise raise any statute of limitations defense in response to
a complaint filed under the [False Claims Act] and/or the common
law relating to the matter on account of the statute of
limitations for any period of time to which the Tolling Period

---

[35] See, Exhibit J.

[36] See, Exhibit J.

applies." Verbatim language to this effect appears in the
Original and 6 Amended Tolling Agreements.[37]

When language in a contract is clear and expressly stated,
the plain meaning of the language applies. See, E.D. Rich, 392
F.2d at 842. There can be no reasonable denial that the United
States clearly expressed that it entered the Tolling Agreements
with an eye toward settlement negotiations only if the statute of
limitations was held in abeyance until the process was complete.
The U.S. was willing to delay initiating a lawsuit in order to
reach a potential settlement with Defendant. The United States
was willing to undertake this course at the request of OVGH only
if its ability to file a complaint pursuant to the FCA was
protected as expressly stated in the Tolling Agreements.

As a result of the Tolling Agreements, then, the statute of
limitations did not begin to run again until the day after the
last effective date of the 6th Amended Tolling Agreement, that
is, October 1, 2004. The statute then ran until it reached its
6-year time limit, that is, January 19, 2006. Since charges
under the FCA were filed on January 19, 2006, all of the
submitted false claims beginning October 14, 1998, forward, were
filed within the statute of limitations. Consequently, laches is
denied as a matter of law to the FCA claims since it is not a
defense to an action filed within the applicable statute of

---

[37] See, Plaintiff's Exhibit J.

limitations.  (See <u>Holmberg v. Armbrecht</u>, 327 U.S. 395 (1946);
see <u>United States v. Repass</u>, 688 F.2d 154, 158 (2d Cir. 1980).
Therefore, because there is an express statutory limitations
period (i.e., Title 31, United States Code, Section 3731(b)),
laches is inapplicable to the FCA claims.

Clearly, the language of the Tolling Agreements does operate
as a bar in this case but against OVGH, preventing it from even
raising the specter of the statute of limitations defense.
Equitable estoppel operates as a bar to a statute of limitations
defense where the defendant took active steps to prevent the
United States from suing in time.  <u>Lucas v. Chicago Trans. Auth.</u>,
367 F.3d 714, 721 (7th Cir. 2004).  Promising not to plead the
statute of limitations is such an active step.  <u>Lucas v. Chicago
Trans. Auth.</u>, 367 F.3d 714, 721 (7th Cir. 2004); <u>Thelen v. Marc's
Big Boy Corp.</u>, 64 F.3d 254 (7th Cir. 1995); <u>Soignier v. Am. Bd.
of Plastic Surgery</u>, 92 F.3d 547, 554 (7th Cir. 1996); <u>Cada v.
Baxter Healthcare Corp.</u>, 920 F.2d 446, 451 (7th Cir. 1990);
<u>United States v. General Iron Industries, Inc.</u>, 2005 WL 956870
(N.D.Ill.).  In the instant case, the tolling agreements contain
the written promises of OVGH not to plead the statute of
limitations as a defense.[38]  The United States relied upon these
promises as expressed in the Original and 6 Amended Tolling
Agreements in not filing suit for over 15 months.  This Court

---

[38] <u>See</u>, Plaintiff's Exhibit J.

needs to hold OVGH to its promises and commitments made in the
Agreements that it acknowledged the stopping of the running of
the statute of limitations for 15 plus months, deny its argument
and bar it from raising the statute of limitations as a defense
in this case.

     2.  <u>Laches</u>

Defendant argues that summary judgment should be granted for
the Defendant and against the United States since the defense of
laches applies to this case.  Defendant advances that the United
States has committed inexcusable delay in pursuing claims against
OVGH concerning Medicare reimbursement practices in two ways:
(1) the United States filed the instant charges some thirteen
(13) years after it began investigating Quorum-managed hospitals,
including but not limited to OVGH, and (2) charges were filed
some eight (8) years after the United States began investigating
Curative partner hospitals.  OVGH assails the United States for
filing charges under the False Claims Act instead of using its
administrative procedures to address perceived irregularities in
cost reports and further chides the government for not warning
OVGH to stop using supposedly illegal Curative-like procedures in
making requests for Medicare reimbursement.  Moreover, OVGH
accuses the government of lying in the bushes awaiting completion
of the Curative lawsuit before launching the same type of
investigation solely at OVGH and then inexcusably letting another

21

4 years lapse before filing charges.  Besides the "inexcusable delay", OVGH claims that it is prejudiced, and thus, judgment should be granted against the United States.

        a.   <u>Laches Does Not Apply to This Case Since the United States Timely Filed Its Complaint Pursuant to the False Claims Act</u>.

The general rule at common law is that "time does not run against the King" ("nullum tempus occurit regi").  Thus, even where Congress has explicitly adopted a statute of limitations applicable against the United States, any limitations period must be construed narrowly because it is in derogation of the common law.  <u>Badarocco v. Commissioner of Internal Revenue</u>, 464 U.S. 386, 391 (1984).  For this reason, the Supreme Court has repeatedly emphasized that no laches defense may be asserted against the United States where it brings suit in its sovereign capacity.  <u>United States v. Summerlin</u>, 310 U.S. 414, 416 (1940) ("it is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights."); <u>Guaranty Trust Co. v. United States</u>, 304 U.S. 126, 132 (1938) (benefit of precluding laches defense against United States accrues to every citizen); <u>Utah Power & Light Company v. United States</u>, 243 U.S. 389, 409 (1917)("As a general rule, laches . . . is not a defense to a suit by [the United States] to enforce a public right or protect a public interest."); <u>United States ex rel. Janssen v. Northrop Corp.</u>, No. CV 87-7845 MRP (C.D. Cal.

May 15, 1992) (laches is barred by the doctrine of sovereign immunity); Herman v. South Carolina National Bank, 140 F.3d 1413, 1427 (11th Cir. 1998), *cert. denied*, 525 U.S. 1140 (1999); See also United States v. Peoples Household Furnishings, Inc., 75 F.3d 252, 254 (6th Cir.) ("the sovereign is exempt from the consequences of its laches"), *cert. denied*, 519 U.S. 964 (1996); Board of County Com'rs for Garfield County, Colo v. W.H.I., Inc., 992 F.2d 1061, *rehearing denied*, (10th Cir. 1993) (holding that "[a]s to its governmental function, the doctrine of laches does not apply to the United States"); United States v. Popovich, 820 F.2d 134, 136 (5th Cir.), *cert. denied*, 484 U.S. 976 (1987). Moreover, laches is not available as a defense against the United States when it is enforcing its rights.  See United States ex rel. Purcell v. MWI Corp., 2003 WL 1498382 (D.D.C. Mar. 25, 2003).  Filing an action under the False Claims Act is a manifestation by the United States that it is entitled to damages as a result of fraudulent activity perpetrated against it by some entity, clearly an expression of a violation of a right of the United States.  See United States ex rel. Roberts v. Aging Care Home Health, Inc., 2006 WL 2915674 (W.D. La., Oct. 6, 2006) ("the defense of laches is not available in an FCA case").

This principle particularly applies when the statute under which the United States brings its action prescribes a limitations period, and the United States complies by filing its

complaint prior to the expiration of such period.  See, <u>Holmberg</u>, 327 U.S. at 395 ("[i]f Congress explicitly puts a [statutory] limit upon the time for enforcing a right, which it has created, there is the end of the matter . . . The Congressional statute of limitations is definitive"); See also <u>RePass</u>, 688 F.2d at 158 (laches is not a defense to an action filed within the applicable statute of limitations).

         b.   <u>Additionally, Laches Does Not Apply to This Case Since the United States Timely Investigated the Charges in This Case Contrary to the Allegations of OVGH</u>.

Contrary to OVGH's assertion of inexorable delay in the investigation of the charges in this case, the United States timely investigated the false claims in this case.  The key, but not only, flaw in OVGH's argument concerns those claims filed by the United States in this case and when they were first investigated.  Simply, yet decisively, the charges here are different than those that were filed in both the <u>Quorum</u> and <u>Curative</u> litigations OVGH relies upon.  For the reasons previously stated in Part IIB of this Response, OVGH's assertions are unfounded.

If counsel for OVGH had actually analyzed the substance of the claims in <u>Quorum</u> and <u>Curative</u>, they would have realized that this case is completely different.  Here, the charges do not concern "reserve cost reports" or "improper marketing and advertising costs".  Contrary to OVGH's inaccurate and self-

serving accusations of delay in investigating this case, the facts show exactly the opposite is true.

This investigation was promptly initiated in mid-February 2002, when Special Agent Murray received a referral letter for possible investigation of certain hospitals.[39] The investigation that was initiated resulted in a determination that OVGH improperly included the Wound Care Center (WCC) in the costs applicable to the Emergency Room (ER), thereby overstating Medicare reimbursement; that there was concern over the amount of management fees being claimed by OVGH; and, finally, that the cost of an autologous blood product, Procuren, was included in the ER drugs to be reimbursed by Medicare even though Medicare, from December 1992 onward, had determined that Procuren was not a reimbursable drug.[40]

Special Agent Murray conducted a timely and extensive investigation from mid-February 2002.[41] Agent Murray interviewed numerous individuals involved in this case and examined thousands of pages of documents to determine if the allegations were substantiated.[42] Substantial intent to commit Medicare fraud by OVGH was uncovered. Notwithstanding the filing of an original

---

[39] See, Murray Declaration, ¶ 2.

[40] Id., ¶ 10.

[41] Id., ¶¶ 2, 4.

[42] Id., ¶¶ 10, 11, 13, 14, 17, 19, 21, 22, 25, 29, 30.

Tolling Agreement and six (6) Amendments covering some 15 plus months from June 25, 2003 to September 30, 2004, Agent Murray continued her exhaustive investigation of the allegations in this case, again showing diligence and forthright investigative effort.

Further illustrating counsel for OVGH's reckless accusations that the United States inexcusably delayed the filing of charges, it must be noted that the delay in the filing of the Complaint was occasioned by the parties' willingness to continue settlement discussions.[43]  When the case failed to settle, the United States drafted its Complaint and filed it in January 2006.  As the facts above show, OVGH not only cannot show inexcusable delay, but rather it willingly agreed to the delay by signing the Tolling Agreements and therefore, cannot, and should not, benefit from the application of the affirmative defense of laches.

Even if this Court should find facts which show "inexcusable delay" on the part of the United States, OVGH's assertion that it was prejudiced by the filing of the Complaint is unfounded in view of the facts of the case, and therefore, its defense of laches is again not supported.

OVGH again argues mistakenly that the United States never brought the core charges against OVGH between 1997 and 2000, notwithstanding that it was actively pursuing those allegations

---

[43] Id., ¶ 34.

in the <u>Quorum</u> and <u>Curative</u> litigations.  As discussed previously
in section IIB above, the charges in this case are separate and
apart from those in the <u>Quorum</u> and the <u>Curative</u> litigations, and
further, OVGH was never investigated by the United States in
those cases.[44]  Counsel also fails to appreciate and/or
acknowledge that it was not until February/March 2002, that the
United States began to actively investigate OVGH.  Coupled with
the fact that an OIG investigation analyzes requests for Medicare
reimbursement from the perspective of the FCA, the United States
had no duty to warn OVGH not to commit False Claims Act
violations.  Indeed, the nature of the claims filed in this case
reflect willful wrongdoing by OVGH in their Medicare submissions.
There are no cases which impose a duty on the United States to
warn hospital providers that they should not intentionally
defraud the government with reimbursement claims.  Yet, that is
the upshot of OVGH's argument, which is simply ludicrous.

OVGH also asserts that evidentiary hurdles prejudice its
ability to defend this action.  OVGH first argues that it took
the government 14 and 8 years, respectively, to build cases
against Quorum and Curative, allegations which are completely
baseless as earlier discussed.  But more notably, Counsel for
OVGH failed to inform this Court that Counsel for OVGH was

---

[44] Rather, the United States, for settlement purposes, accepted Quorum's
information that it only managed OVGH from 1988 to 1994.  See, Response, p. 12.

present in 2002 on multiple occasions when many of its employees were interviewed by the OIG.[45]  Thus, counsel's allegations of "hardships" it faces in trying to mount a defense (memory of witnesses have faded, documents harder to find, witnesses leaving) are ones of its own making, not ones caused by the United States.  In 2002, counsel could have located and interviewed witnesses and gathered documents, especially in light of Agent Murray's investigation in that time period.[46]  OVGH cannot now blame the government for "creating hurdles" when it was solely responsible for not undertaking its own timely and diligent investigation when witnesses and documents were readily available.

Therefore, for all of the reasons listed above, OVGH cannot show that it was prejudiced by actions of the United States, and summary judgment for OVGH based on laches must be denied.

### 4.  Estoppel

Defendant argues that summary judgment should be granted to the Defendant and against the United States due to equitable estoppel.  OVGH argues that all three (3) elements of estoppel are shown in this case and that the United States exhibited affirmative misconduct by wrongfully remaining silent after determining that items were wrongfully submitted for

---

[45] See, Murray Declaration, ¶¶ 11, 13, 14.

[46] See, Murray Declaration, ¶¶ 7, 9, 11, 13, 14, 16, 25, 26, 30.

reimbursement on cost reports.  OVGH contends that the United

States knew that Quorum and Curative-managed providers were

submitting improper reimbursement requests while OVGH had no such

knowledge.  This argument is meritless, and summary judgment must

be denied.

"Estoppel is an equitable doctrine which a court may invoke

to avoid injustice in particular cases."  See Fisher v. Peters,

249 F.3d 433, 444 (6th Cir. 2001).  "[T]he traditional elements

of equitable estoppel are:  (1) misrepresentation by the party

against whom estoppel is asserted; (2) reasonable reliance on the

misrepresentation by the party asserting estoppel; and

(3) detriment to the party asserting estoppel."  LaBonte v.

United States, 233 F.3d 1049, 1053 (7th Cir. 2000).  The United

States, however, " … may not be estopped on the same terms as any

other litigant."  Heckler v. Cmty. Health Servs. of Crawford

Cty., Inc., 467 U.S. 51, 160 (1984).  Instead, "[a] party

attempting to estop the government has a very heavy burden" in

sustaining its argument.  Fisher, 249 F.3d at 444.  At a minimum,

the party must demonstrate some "affirmative misconduct" by the

United States in addition to showing all of the other elements of

estoppel.  Id.  The definition of "affirmative misconduct" has

been interpreted by several courts.  The Ninth Circuit defines

"affirmative misconduct" as a deliberate lie or a pattern of

false promises.  Socop-Gonzalez v. I.N.S., 272 F.3d 1176, 1184

29

(9th Cir. 2001)(*en banc*).  The Ninth Circuit rendered a more developed definition of the term, explaining that "[n]either the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct."  Sulit v. Schiltgen, 213 F.3d 449, 454 (9th Cir. 2000).  The Seventh Circuit defines "affirmative misconduct" as "more than mere negligence … It requires an affirmative act to misrepresent or mislead.  LaBonte, 233 F.3d at 1053.  The Fifth Circuit, likewise, defines "affirmative misconduct" as "something more than merely negligent conduct."  United States v. Marine Shale Processors, 81 F.3d 1329, 1350 n. 12 (5th Cir. 1996).  Instead, the "official [of the United States] must intentionally or recklessly mislead the estoppel claimant."  Id. at 1350.  The Fourth Circuit defines "affirmative misconduct" as lying rather than misleading and as malicious, not negligent, conduct.  See Keener v. E. Associated Coal Corp., 954 F.2d 209, 214 n. 6 (4th Cir. 1992).

Equitable estoppel, however, does not apply against the United States in a suit to recover public funds.  Office of Personnel Management v. Richmond, 496 U.S. 414 (1990); United States v. Walcott, 972 F.2d 323, 327-328 (11th Cir. 1992).  In Richmond, the Supreme Court reaffirmed a longstanding precedent emphasizing that claims for estoppel cannot be entertained where public money is at stake.  See 496 U.S. at 434.  Following a

30

review of cases involving claims of estoppel against the federal government, the Court noted that every finding of estoppel had been reversed that it had reviewed and that "[e]ven our recent cases evince a most strict approach to estoppel claims involving public funds." See 496 U.S. at 422, 426. "When the [United States] is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the [United States] may not be estopped on the same terms as any other litigant." Heckler, 467 U.S. at 60; see also United States v. Thompson, 749 F.2d 189, 193 (5th Cir. 1984) (the United States cannot be bound by unauthorized or incorrect statements of its agents).

Clearly, the Complaint pursuant to the FCA filed by the United States against OVGH is one to recover illegally obtained government funds. Therefore, Defendants' estoppel argument utterly fails because of Richmond.

Even if Defendant's argument somehow survives the strict standard of Richmond, it still is dashed for the failure of OVGH to show evidence of the elements of estoppel, especially evidence of affirmative misconduct. (See Taylor v. United States Treasury Department, 127 F.3d 470, 474 (5th Cir. 1997) ("a party asserting the defense must establish affirmative governmental misconduct, in addition to the traditional elements of estoppel").

OVGH failed to discuss the effect of <u>Richmond</u> in its Brief and also failed to indicate that it did not apply in this case. Even if this Court rules, however, that the holding in <u>Richmond</u> is not applicable in this case, OVGH is not entitled to the defense of equitable estoppel since it has failed to show a misrepresentation or reasonable reliance on the findings of a report which led to its detriment let alone affirmative misconduct on the part of a government agent.

OVGH claims the fiscal intermediary made a misrepresentation in giving some sort of approval to the limited desk audits and full audit conducted in 1998-2000.  Yet the evidence of record shows that the reviewers of the fiscal intermediary performed their reviews in 1998-2000 which did not involve the same focus as the inquiry made by Special Agent Murray.[47]  Further, the reviewers lacked the information that Agent Murray received in February 2002, which led her to uncover the wrongful requests for payment.  Thus, any "approval" allegedly given during the desk reviews and full audit had nothing to do with the items identified by Special Agent Murray as false claims.  Therefore, the actions of the reviewers were not misrepresentations which anyone, let alone a knowledgeable party like OVGH, should have relied on.

---

[47] <u>See</u>, Cipollone Declaration, ¶¶ 4-7, 10-17, 20-22.

OVGH has also not shown reasonable reliance because it cannot.  In <u>Heckler</u>, a Medicare intermediary gave erroneous advice to Community Health Services of Crawford County, a charitable healthcare provider.  Relying on the intermediary's advice, the healthcare provider received reimbursement funds to which it was not entitled and, as a result, expanded its operations and services.  Community asserted that Medicare was stopped from recovering its overpayments.  The United States Supreme Court held, however, that Community Health Services did not reasonably rely on the intermediary's advice to its detriment, and the absence of those two elements were fatal to its estoppel claims.  The Supreme Court noted the general rule "that those who deal with the government are expected to know the law and may not rely on the conduct of Government agents to the contrary".  See <u>Heckler</u>, 467 U.S. at 63.  OVGH cannot argue that it is excused from knowing what items were reimbursable from Medicare and which items were not.  Special Agent Murray learned from several witnesses that key management figures were informed of improper submissions to Medicare by OVGH, but the advice to self-disclose was ignored.[48]

OVGH also cannot show affirmative misconduct on the part of the government, especially in regards to keeping silent.  For the same reasons as described earlier, it took receipt of information

---

[48] <u>See</u>, Murray Declaration, ¶ 11.

in February 2002 and a subsequent in-depth investigation by Agent
Murray to discover the wrongdoing as alleged in the Complaint.
OVGH cannot point to any evidence which shows that any government
official had knowledge of information which was withheld from
OVGH.  To the contrary, the evidence shows that OVGH management
figures authorized the submission for Medicare reimbursements
with knowledge that some of the submissions were improper and not
reimbursable.[49]  OVGH was armed with information that took an
extensive government investigation to uncover.  As such, no
showing of affirmative misconduct has been made, and estoppel on
those grounds should be denied.

     5.   The United States Timely Filed Its Common Law
            Claims Since the Applicable Statute of Limitations
            Is 6 Years.

OVGH baldly asserts that the common law claims filed in the
Complaint (Count 4, Unjust Enrichment; Count 5, Payment by
Mistake; Count 6, Disgorgement of Illegal Profits; Count 7,
Common Law Fraud; and, Count 8, Common Law Recoupment) are void
due to the running of the 3-year statute of limitations.  This
argument is meritless and faulty.

The gist of the Complaint filed by the United States is that
OVGH intentionally and/or wrongfully submitted requests for
Medicare reimbursement in violation of the FCA but also in
violation of the contract ("provider agreement") between OVGH and

---

[49] See, Murray Declaration, ¶¶ 11, 17.

34

Medicare.  That provider agreement mandates that providers submit proper requests for reimbursement.  The Complaint of the United States in this case clearly asserts that OVGH is in violation of Medicare regulations and agreements for each claim submitted.  As such, every violation then is one sounding in contract.  It is without dispute that the statute of limitations for claims sounding in contract, applicable in this case to Counts 4-8, is six years pursuant to Title 28, United States Code, Section 2415(a); see also <u>United States v. Kensington</u>, 1993 WL 21446 (E.D.Pa.) *14.  As a result, the argument for summary judgment advanced by OVGH as to these common law causes of action should be denied.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney
Western District of Pennsylvania


s/Albert W. Schollaert
ALBERT W. SCHOLLAERT
Assistant United States Attorney
U.S. Post Office and Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7416
PA ID No. 23629


s/Paul E. Skirtich
PAUL E. SKIRTICH
Assistant United States Attorney
U.S. Post Office and Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7418
PA ID No. 30440

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of December, 2007, a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment was electronically filed and/or served by first-class U.S. mail, to the following:

Mark A. Rush, Esquire
Kirkpatrick & Lockhart Preston Gates Ellis LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312


s/Paul E. Skirtich
PAUL E. SKIRTICH
Assistant U.S. Attorney